# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-40012-JAR-01 |
| ) | |
| JOHN T. ARLETT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

This matter is before the Court on Defendant's Motion to Suppress (Doc. 11) and Motion in Limine (Doc. 12). Defendant John T. Arlett was traveling in a Ford F-450 Super Duty truck on December 19, 2012, when Officer Richard Jimerson stopped him for a commercial motor vehicle inspection. After completing the inspection, Officer Jimerson searched three spools of cable conduit in the back of the truck and eventually located 83 bundles of marijuana. Defendant argues that the initial stop was unlawful and that Defendant's encounter with Officer Jimerson after the commercial vehicle inspection was not a consensual encounter, rendering any consent ineffective.

On August 8, 2013, the Court held a hearing on the motion to suppress and took the matter under advisement. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule. The Court will not suppress the evidence discovered by the officers. Further, the Government states that it will not introduce the evidence addressed in the motion in limine, so that motion is denied as moot.

**I.	Facts**

Based on the testimony and the videotape evidence submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence. On December 19, 2012 at approximately at 12:10 pm, Officer Jimerson observed a white Ford truck heading eastbound on Interstate 70. He observed the truck and believed it to be a Ford F-450 "Super Duty" or F-550 truck, both of which Officer Jimerson believed, based on his experience and training, to have a Gross Vehicle Weigh Rating (GVWR) of over 10,001 pounds. Officer Jimerson noticed three large industrial spools secured to vehicle's cargo bed, which appeared to be secured in a manner consistent with a commercial carrier. Officer Jimerson also noted that the truck had a Tommy Gate mechanical lift, a piece of equipment often found on commercial vehciles. The truck did not have a visible USDOT number or company name, and was not marked as "Private Carrier Not For Hire," but Officer Jimerson reasonably believed that the truck was a commercial vehicle subject to inspection under Kansas law.

Officer Jimerson is trained as a commercial vehicle inspector and is required to inspect at least twelve commercial motor vehicles per quarter to remain a certified inspector in good standing. He decided to conduct a Commercial Vehicle Safety Alliance North American Standard (NAS) Level II Inspection on the Ford truck. He activated his emergency lights and stopped Defendant's vehicle. Officer Jimerson made contact with Defendant through the passenger's-side window and told him he was stopped for failure to display a USDOT number and the company's name on his vehicle. Defendant stated the truck was private and not commercial, and that his vehicle's GVWR was 10,000 pounds, placing it below the threshold for commercial vehicles. Officer Jimerson walked over to the driver's side to check the

2

manufacturer's sticker and found the vehicle's GVWR to be 16,500 pounds.

Officer Jimerson asked Defendant about his trip and Defendant told him that he had traveled to Albuquerque, New Mexico, to pick up three spools of fiber optic conduit and was now headed to St. Louis. Defendant claimed he worked for Huff Incorporated in Florissant, Missouri and had previously taken the spools to Albuquerque, but a union had gotten involved and precluded the installation of the cable. Defendant said that Huff was not paying for his mileage or the cost of the conduit, and that he believed this made the trip a private trip. Officer Jimerson told Defendant that he would need to display a USDOT number and Huff's name on his vehicle when he was doing work for Huff Incorporated, because he was subject to commercial vehicle regulations.

Officer Jimerson went back to his vehicle to complete a Driver Vehicle Examination Report and run a communication check on Defendant. The communication check came back with the following information: (1) Defendant had a previous drug arrest in Pennsylvania, (2) the Florissant address for Huff Incorporated was just a post office box, (3) his phone had a Pennsylvania area code, and (4) Huff Incorporated was not located in Florissant. The report was negative on any drug association from New Mexico for Defendant or his car.

Officer Jimerson proceeded to finish filling out the examination report and to issue Defendant a citation. Officer Jimerson gave Defendant his citation and handed back his license and registration, and then Defendant signed a commercial vehicle inspection form. After signing the inspection, Defendant had all of his own paperwork back in his possession. After receiving his documentation, Defendant had his left hand on the steering wheel and right hand on the gear shift, giving the impression that he was ready to leave. Officer Jimerson continued talking to

3

Defendant about the conduit, based on his suspicion that Defendant might be hauling contraband. When asked about the cost of the conduit, Defendant said he did not know, signed an inspection form, and handed a piece of the conduit to Officer Jimerson, which Officer Jimerson then handed back.

Defendant told Officer Jimerson that his wife was in Pennsylvania, and admitted to the previous drug arrest. Officer Jimerson asked Defendant if there was anything inside the spools and whether it would be okay if he looked at them. Defendant agreed. Defendant was extremely nervous throughout his interactions with Officer Jimerson. Defendant then exited the truck, lowered the vehicle's liftgate, and Officer Jimerson examined the spools. The bolt heads holding the spool together showed signs of recent removal and Officer Jimerson found that the spools appeared to contain a false arbor that could conceal drugs. Officer Jimerson then called Technical Officer Edie with his drug canine PSD Tango. When Officer Edie arrived, he stated that the metal sleeve configuration in the spool did not look normal, based on his prior experience with conduit. Officer Edie deployed PSD Tango, who initially gave an indication that he smelled drugs, but was unable to sit because of the confined space. PSD Tango again alerted to the presence of drugs in the spools, and on this second alert, managed to sit in the confined space. The officers then drilled into the metal sleeve of the spool, used a fiber optic scope to look inside, and noticed cellophane wrapped bundles. Defendant was placed under arrest, given his *Miranda* warnings, and transported to Topeka. The offiers x-rayed the spool, which revealed 83 bundles inside. The officers field tested the bundles and found them to be positive for marijuana. The officers eventually recovered over 1500 pounds of marijuana.

## II. Discussion

Officer Jimerson's stop of Defendant's truck falls within the category of regulatory searches.

> A regulatory search is governed by the Fourth Amendment but does not require probable cause as defined traditionally by the courts. In general, probable cause, and the less stringent standard of reasonable suspicion, require particularized suspicion—that is, the officer must have some articulable basis to believe that the individual to be searched or seized has committed or is committing a crime. In contrast, a regulatory search is justified if the state's interest in ensuring that a class of regulated persons is obeying the law outweighs the intrusiveness of a program of searches or seizures of those persons.[1]

Thus, a regulatory stop requires neither a warrant nor probable cause. Defendant does not challenge the constitutionality of the Kansas motor carrier regulatory scheme as a whole.

This motion concerns a vehicle that Defendant maintains was not within the regulatory framework, because he maintains the vehicle was a noncommercial vehicle that he used for private, not commercial, trips. The Court rejects this argument for two reasons. First, Defendant relies on Kansas Administrative Regulation 82-4-3, titled "Exemption from the motor carrier safety regulations," which states that, "[t]he [Kansas] safety regulations and the federal safety regulations adopted by reference in this article shall not apply to . . . [t]he occasional transportation of personal property by private motor carriers that is not for compensation and is not in the furtherance of a commercial enterprise," and the federal regulations, which contain an identical exemption.[2] But Defendant was transporting personal property in furtherance of a commercial enterprise; by his own testimony, he was retrieving conduit from New Mexico for

---

[1] *United States v. Seslar*, 996 F.2d 1058, 1061 (10th Cir. 1993).

[2] 49 C.F.R. 390.3(f)(3).

5

use on his later cable installation contracts. Transportation of these supplies was, therefore, in furtherance of a commercial enterprise, and thus Defendant did not qualify for this exemption.

Second, even if Defendant did qualify for the exemption, under the Kansas commercial motor vehicle statutes and regulations, the private motor carrier safety exemption does not exempt a vehicle from random stops for commercial motor vehicle code enforcement. Under K.S.A. 74-2108(b):

> the superintendent and members of the Kansas highway patrol are hereby authorized and directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations relating to such laws, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations.

Under K.S.A. 66-1,108(i), "private motor carrier" means "a person who provides transportation of property or passengers, by commercial motor vehicle and is not a for hire motor carrier." Kansas law defines a "commercial motor vehicle" as one that has "a gross vehicle weight rating . . . of 10,001 or more pounds."[3] Finally, under K.S.A. 66-1,108(c), "gross vehicle weight rating" means "the value specified by the manufacturer as the loaded weight of a single motor vehicle."

Here, Defendant drove a truck with a GVWR well over 10,001 pounds, making the truck a commercial motor vehicle under Kansas law. At the time of the stop in question, Defendant was not for hire and was transporting property, albeit his own commercial property, qualifying him as a private motor carrier. And as a private motor carrier, Defendant could be stopped by

---

[3]Kan. Admin. Reg. § 82–4–1 (2008).

6

members of the Kansas highway patrol under Kansas's regulatory framework. Even if the safety exemption discussed above applied to Defendant, he could still be stopped pursuant to the Kansas regulatory program.

For these two reasons, the Court rejects Defendant's argument that the stop was improper because he was not subject to regulation under Kansas law.

Defendant next argues that Officer Jimerson could not have known that Defendant's truck was a commercial vehicle. No case clearly sets out what standard applies to an officer's decision to make a regulatory stop. The Tenth Circuit determined that "the spot check provisions [in the Kansas motor carrier statues] do not authorize the random stop of any truck traveling on the Kansas highways to first determine whether the truck is carrying a commercial load."[4] And the Tenth Circuit has also held that an officer's reasonable mistake as to whether a vehicle could be inspected under the Kansas commercial vehicle inspection program did not justify the stop.[5] So it is clear that an officer cannot simply stop any vehicle to determine whether the vehicles is subject to inspection. All regulatory stops must be reasonable in all respects,[6] and thus the Court concludes that an officer therefore must reasonably believe that the vehicle he is stopping falls within the regulatory framework in order to stop the vehicle. This reasonable belief will not save the stop if the vehicle is not subject to inspection, but it is required for a constitutional stop even when the vehicle is subject to inspection.

Here, Officer Jimerson testified that, when he saw the Defendant's truck, he believed the

---

[4]*Seslar,* 996 F.2d at 1062.

[5]*United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006).

[6]*United States v. Ibarra*, 955 F.2d 1405, 1408 (10th Cir.1992).

7

truck to be a Ford F-450 or F-500, both models he had stopped many times and both models that exceed the 10,000 pound threshold. He further testified that, in his experience, even Ford F-350 vehicles are over the 10,000 threshold. He also detailed numerous characteristics of Defendant's vehicle that suggested to him that it was a commercial vehicle: stake-sided bed, lift gate, cargo consisting of three commercial-sized spools of conduit, and professional cargo securement, among other characteristics. Based on this testimony, the Court finds that Officer Jimerson reasonably believed that the Defendant's vehicle was a commercial vehicle, subject to inspection under Kansas law. In all respects, this initial stop was a constitutional regulatory stop, pursuant to Kansas law.

After the initial stop, Defendant eventually consented to Officer Jimerson's request to inspect the conduit spools. Defendant argues that his consent was not valid because the encounter was not a voluntary encounter. After a traffic stop, "if the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs."[7] The voluntary consent need not be explicit; "after an officer issues the citation and returns any materials provided, the driver is illegally detained only if the driver has objectively reasonable cause to believe that he or she is not free to leave."[8] The return of the documents does not necessarily indicate that the driver is free to leave. A "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance

---

[7] *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997).

[8] *Id.* (citing *United States v. Shareef*, 100 F.3d 1491, 1501 (10th Cir. 1996)).

8

might be compelled" may suggest that a detention has not ended."[9] And, although an officer may clearly indicate to a driver that the detention has ended by telling the driver he is free to go, the Tenth Circuit has been clear that a failure to do so does not necessarily prevent the stop from becoming a consensual encounter.[10] The question for this Court to resolve is whether, under the totality of the circumstances, Defendant had an objectively reasonable cause to believe that he was not free to leave after Officer Jimerson returned his documents.

In particular, Defendant argues in his brief that a reasonable person would never have felt free to leave before Officer Jimerson began questioning him about drugs because he had not yet received all of his inspection paperwork. But this contradicts testimony from the suppression hearing. At that hearing, both Officer Jiminez and Defendant testified that Officer Jiminez did not begin asking questions related to his drug investigation until after he had returned Defendant's paperwork; the Court credits this version of events. The suppression hearing testimony also presents additional evidence that Officer Jiminez did not make a "coercive show of authority:" both Defendant and Officer Jiminez testified that Officer Jiminez's demeanor was not domineering, that he was not touching the vehicle to prevent Defendant from leaving, that he did not place his hand on his weapon, and that he did not yell at or otherwise overtly coerce the Defendant. Moreover, the videotape of the stop contains some discernable audio of the officer's request to search the spools, and his tone is even and cordial; the videotape provides no evidence that the encounter was anything other than consensual. Aside from continued questioning during the stop and his own impression that he should answer Officer Jiminez's questions "because he

---

[9] *Id.* (citing *United States v. Turner*, 928 F.2d 956, 959 (10th Cir.1991)).

[10] *Id.* (holding that informing a driver he is free to go "is not required for an encounter to be consensual").

9

is a police officer," Defendant can offer no evidence that the encounter was not consensual.[11] Defendant argues that, because Officer Jimerson never stopped asking him questions, the encounter never became consensual. He bases this argument on the statement from a Tenth Circuit case that, "once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave."[12] But that quote is taken out of context; the next sentence states that "[t]he detention cannot be continued beyond this point unless the driver consents to further questioning."[13] Similarly, in *United States v. Manjarrez*, the Tenth Circuit noted that:

> [a] stop generally ends when the officer returns the driver's license, registration, and insurance information. At this point, questioning must cease and the driver must be free to go. This general rule, however, is subject to an important exception. Additional questioning unrelated to the traffic stop is permissible if the detention becomes a 'consensual encounter. . . . [w]hether an individual consents to further questioning is based on the totality of the circumstances."[14]

Where, as here, Defendant continues answering an officer's questions after receiving all of his documents, he has begun a consensual encounter with the officer.[15]

Based on the evidence offered at the suppression hearing, the Court finds that, at the time Officer Jimerson asked Defendant for permission to inspect the spools, the encounter was a consensual one. Defendant's consent was valid and allowed Officer Jimerson lawful access to

---

[11] *United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir. 1975) (defendant has burden of proving a prima facie Fourth Amendment violation).

[12] *United States v. Burleson*, 657 F. 3d 1040, 1045 (10th Cir. 2011).

[13] *Id.*

[14] 348 F.3d 881, 885 (10th Cir. 2003) (internal citations omitted).

[15] *United States v. Werking*, 915 F.2d 1404, 1409 (10th Cir. 1990).

10

the spools.

Defendant next argues that the search of the spools became unlawful after the canine failed to alert to the spools. But Officer Jason Edie testified at the suppression hearing that his canine, PSD Tango, alerted to the spools at least twice. This testimony is verified, to some degree, by the video of the stop, which shows PSD Tango alerting and sitting in the truck bed. Officer Edie also testified concerning PSD Tango's training and experience, which demonstrated that PSD Tango is well-trained and reliable. An alert by a properly trained canine is sufficient to establish probable cause to justify a search of a vehicle or closed container.[16] Although a defendant may present evidence to show that the canine is unreliable,[17] the defendant bears the burden of proving such evidence, and Defendant has not done so in this case. Thus, the Court finds that PSD Tango's alert gave the officers probable cause to continue their search by drilling into the spools.

Finally, Defendant makes a brief argument that Officer Jimerson appears to have singled out this Defendant's vehicle based on its out of out-of-state registration, somehow infringing Defendant's constitutional right to travel. The Court has already discussed Officer Jimerson's decision to stop the vehicle, based on his reasonable belief that it was a commercial vehicle subject to inspection under Kansas law. The out-of-state registration does not appear to have played a significant role in this stop, and so the Court rejects this argument.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 11) is **DENIED**.

---

[16]*United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007).

[17]*United States v. Berrelleza*, 90 Fd. Appx'. 361, 365 (10th Cir. 2004) (citing *United States v. Outlaw*, 134 F. Supp. 2d 807, 812 (W.D. Tex. 2001)).

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine (Doc. 12) is **DENIED AS MOOT.**

**IT IS SO ORDERED**.

Dated: <u>August 23, 2013</u>

                                            <u>S/ Julie A. Robinson</u>
                                            JULIE A. ROBINSON
                                            UNITED STATES DISTRICT JUDGE